UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DAME PRODUCTS,

                        Plaintiff,

    -against-

THE METROPOLITAN TRANSIT
AUTHORITY, JANNO LIEBER, individually
and in his official capacity as Chief
Development Officer and President of MTA
Capital Construction, and PAT FOYE,
individually and in his official capacity as
Chairman and Chief Executive Officer of the
MTA,

                        Defendants.

**COMPLAINT**

Plaintiff Dame Products, by and through its attorneys, Emery Celli Brinckerhoff

& Abady LLP, for its Complaint alleges as follows:

## PRELIMINARY STATEMENT

1.      Imagine you are a woman standing in an MTA subway car.  Look left,

and you see phallic cactuses—both flaccid and erect—which promote erectile dysfunction

medication beneath the slogan "hard made easy."  Look right, and your eye catches an

advertisement for "Kyng"-sized condoms, their foil packets shiny.  Across the way is an image

of a woman, midriff exposed and bra visible beneath her sheer shirt.  The ad, which touts

female libido medication, reads: "Turned on.  On your terms."  And just overhead are

advertisements for the Museum of Sex, featuring sets of naked buttocks or women dancing in a

room full of inflated plastic breasts.

2.      Now imagine you reach your destination and step off of the train.

Plastered eight feet high on the station wall is an advertisement for breast augmentation

services; a woman suggestively cradles petite tangerines and enormous grapefruits in front of her chest.  A neighboring photograph of bare cleavage features the words: "Made in New York."  A sign promoting a travel booking company proclaims: "Get Wet.  (On the beach, not from the guy next to you)."  And prominently displayed is an advertisement for the 2010 movie "The Virginity Hit" that trumpets: "Still a Virgin? For help call 888-743-4335 toll free."

3.      Just a few of these images are pictured here:

 



 

4.      This scenario is not just your imagination.  Each one of these advertisements was submitted to the MTA for display in trains, buses, and subway stations. Each one was given the MTA's stamp of approval.  Each one was displayed in full view of every New Yorker who uses public transit to commute—adults and children alike.  The

2

businesses behind each advertisement reaped the tremendous financial benefit and prestige of advertisement space on the MTA's well-trafficked property.

5.     But what you do *not* see in the subway car, in the station, or anywhere else around you are advertisements for Plaintiff Dame Products ("Dame"), which manufactures tasteful, innovative, and widely-praised tools for women's sexual wellness.

6.     You do not see Dame's advertisements because the MTA—in contravention of the First Amendment, due process, equal protection, and common sense—has banned them from being displayed on MTA property.

7.     In July 2018, Dame submitted advertisements to the MTA for approval. The MTA then strung Dame along for six months.  In that time, Dame spent approximately $150,000 of its scant resources to incorporate the MTA's feedback, submit revised advertisements, and order additional inventory, all in reliance on the MTA's representation that it would accept Dame's materials.

8.     But in December 2018, the MTA precipitously denied Dame's request. Although the MTA has previously welcomed advertisements that celebrate human sexuality and openly discuss sexual health and function—not to mention advertisements that use sexual imagery or explicit text to sell consumer goods—the MTA excluded Dame from this vibrant public discourse and denied Dame coveted advertising space.

9.     Unable to justify this arbitrary and unlawful decision, the MTA cited only a bogus interpretation of its own advertising regulations ginned up for the sole purpose of quashing Dame's proposed images.

10.     The advertisements banned by the MTA (all pictured below) include these:

 

11.     The MTA's decision to reject Dame's advertisements reflects no legitimate principle of law.  Instead, it reveals the MTA's sexism, its decision to privilege male interests in its advertising choices, and its fundamental misunderstanding of Dame's products, which have transformed the sexual health and wellness of more than 100,000 consumers.

12.     In 2019, the MTA's Victorian view of female sexuality and the First Amendment cannot stand.  The MTA's censorship of Dame's advertisements cannot stand.  All New Yorkers—and all women—deserve better.

13.     This civil rights action pursuant to 42 U.S.C. § 1983 seeks damages for the MTA's violations of Dame's rights to free speech, due process, and equal protection under the First and Fourteenth Amendments of the United States Constitution, declarations that the MTA's conduct was unlawful and improper, and an injunction requiring the MTA to approve and display Dame's advertisements.

**JURISDICTION AND VENUE**

14.     This action arises under the First and Fourteenth Amendments to the United States Constitution, 42 U.S.C. §§ 1983 and 1988.

4

15.     This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343.

16.     Venue is proper in this Court under 28 U.S.C. § 1391(b) because Defendant is located in this District and because a substantial part of the events giving rise to the claims occurred in this District.

### JURY DEMAND

17.     Plaintiff demands trial by jury.

### PARTIES

18.     Plaintiff Dame Products is incorporated under the laws of the State of New York.  Dame was founded to revolutionize the sex toy industry and design exceptional tools for sex to enhance intimacy.

19.     Dame achieves its objectives through a variety of lawful means, including through the exercise of its right to freedom of speech under the United States Constitution.  Dame exercises its right to freedom of speech and promotes its objectives by, *inter alia*, purchasing advertising space on transit authority property in major cities throughout the United States, including New York City.

20.     Defendant Metropolitan Transit Authority is a public benefit corporation duly organized under the laws of the State of New York.  It operates buses, subways, and regional rail lines in and around New York City.

21.     As a government agency, the MTA is mandated to comply with the First and Fourteenth Amendments to the United States Constitution.  For the purposes of claims arising under 42 U.S.C. § 1983, the MTA is treated as a municipal agency when determining its liability.

22.     At all relevant times herein, Defendant Janno Lieber was and is the Chief Development Officer and President of MTA Capital Construction.  In his capacity as Chief Development Officer and President of MTA Capital Construction, Defendant Lieber, on behalf of the MTA, was and is responsible for adopting, creating, and enforcing the policies and practices of the MTA, including the MTA Advertising Policy (the "Policy"), a publicly available document that governs which advertisements are selected for display on MTA Property.  Defendant Lieber is being sued in his individual and official capacity.

23.     At all relevant times herein, Defendant Pat Foye was and is the Chairman and Chief Executive Officer of the MTA.  In his capacity as Chairman and Chief Executive Officer, Defendant Foye, on behalf of the MTA Board of Directors, was and is responsible for adopting, creating, and enforcing the policies and practices of the MTA, including the MTA Advertising Policy.  Defendant Foye is being sued in his individual and official capacity.

## **FACTUAL ALLEGATIONS**

### I.     **The History of Plaintiff Dame Products**

24.     Dame is a groundbreaking company that has revolutionized the sex toy industry in just four years since its inception.

25.     In the words of The New York Times: Dame leads "a tech-savvy and female-led women's sexuality movement that has made its home in New York."[1]

26.     Dame's Founders, Chief Executive Officer Alexandra Fine and Chief Technology Officer Janet Lieberman, realized they were onto something when their first

---

[1] *See* www.nytimes.com/2017/08/18/nyregion/women-of-sex-tech-unite.html, last accessed June 18, 2019.

collaboration, the vibrator "Eva," raised more than $500,000 on Indiegogo, a crowdfunding website, in November 2014.

27.     Intent on refining their in-depth research, smart design, and empathic, consumer-centered approach, Fine and Lieberman teamed up and began crafting meticulously engineered vibrators and other sex tools and toys that have been praised by news outlets including The New York Times, W Magazine, Vanity Fair, Fast Company, Forbes, BBC, the Today Show, and Wired.

28.     Dame's advertisements—including advertisements that were rejected by the MTA—currently appear on New York City kiosks and bus stops via Intersectional Media and on podcasts including Savage Lovecast and The Reductress Minute.

### *Alexandra Fine and Janet Lieberman: Dame's Founders*

29.     CEO Alexandra Fine, a lifelong student of sexual health, earned her Masters' Degree in Clinical Psychology with a concentration in sex therapy from Columbia University.

30.     After receiving her degree, Fine realized that she could better serve the sex tech industry by means of entrepreneurship than through her planned career in sex therapy. In 2014, she began developing vibrator prototypes on her own, seeking feedback from friends to assess viability and pinpoint key areas for innovation.

31.     Fine's groundbreaking contributions to the sex tech field led Forbes Magazine to name her to its prestigious "30 Under 30 – Retail and Ecommerce" list in 2018.

32.     Dame CTO Janet Lieberman obtained her B.S. in mechanical engineering from MIT and spent nearly a decade designing and creating an array of unique

products, from dustpans and bath thermometers to 3D printers.  Lieberman has particular expertise in the consumer electronics industry.

33.     After a number of years honing her acumen in the design community, Lieberman noticed that vibrators—marketed almost entirely to women—were neither developed nor manufactured to the same standards as most other consumer goods.

34.     Realizing their distinct backgrounds and skillsets formed a perfect complement, Fine and Lieberman joined forces in Brooklyn in 2014 and founded Dame Products to imbue the sex toy industry with sorely-needed research; smart design; empathic, consumer-centric methods; and a focus on sexual health and well-being.

### Dame's Mission to Close the "Pleasure Gap" and Promote Sexual Health and Wellness

35.     Dame was founded to address fundamental inequalities between men and women in heterosexual encounters.

36.     "Pleasure is not equitable."[2]  Cisgendered, heterosexual women are four times more likely than men to say that sex is not pleasurable for them.[3]  And cisgendered, heterosexual men have twenty- to fifty-percent more orgasms than cisgendered, heterosexual women during partnered sexual encounters.[4]

37.     One study showed that cisgendered men "usually" or "always" have orgasms during sex, while only thirty-nine percent of cisgendered women said the same.[5]

---

[2] Nina Callens and Rena McDaniel, "What Is the Pleasure Gap?", *available at* www.dameproducts.com/blogs/journal/what-is-the-pleasure-gap, last accessed on June 18, 2019.
[3] *Id.*
[4] *Id.*
[5] Lisa D. Wade, Emily C. Kremer, and Jessica Brown, *The incidental orgasm: the presence of clitoral knowledge and the absence of orgasm for women*, 42(1) Women Health 117 (2005).

38.     Another showed that forty-three percent of women suffer from some kind of sexual dysfunction, compared with only thirty-one percent of men.[6]

39.     And another showed that women report more pain during sex than men.[7]

40.     Dame seeks to level the playing field by designing products that can make sex equally enjoyable for men and women.  Dame's current array of five tools for sex is designed to close the notorious "pleasure gap" by catering to women's arousal, libido, pleasure, and sexual wellness.

41.     Dame's research—and a plethora of research conducted by medical professionals specializing in sexual wellness—proves that vibrators and other sex tools are not just ways to create or enhance physical sensations of pleasure.  As the medical community has long known, genital vibration is also beneficial—and for many women, essential—for treating a variety of sexual conditions.

42.     Vibrators are frequently prescribed by medical professionals to address an array of women's sexual health issues, from libido- and arousal-related difficulties to physical pain and discomfort.[8]

43.     Genital vibration can effectively treat anorgasmia (the inability to have an orgasm).[9]  It can facilitate arousal and orgasm as a treatment for female sexual arousal

---

[6] Linda L. Barkacs, Craig B. Barkacs & Kristine Ehrich, *Girls Just Want to Have Fun: Issues Surrounding the Marketing of Sexual Enhancement Products for Women*, 18 J. L. Bus. & Eth. 63, 64 & n.6 (2012) (hereinafter "Barkacs").

[7] E.J. Bartler & R.B. Fillingim, *Sex differences in pain: a brief review of clinical and experimental findings*, 111(1) British Journal of Anaesthesia, 52, 52 (2013).

[8] Jordan E. Rullo, Tierney Lorenz, Matthew J. Ziegelmann, Laura Meihofer, Debra Herbenick & Stephanie S. Faubion, *Genital vibration for sexual function and enhancement: a review of evidence*, Sexual and Relationship Therapy 1, 2 (2018) (hereinafter "Rullo"); *see also* Debra Herbenick, Michael Reece, Stephanie Sanders, Brian Dodge, Annahita Ghassemi, & J. Dennis Fortenberry*, Prevalence and Characteristics of Vibrator Use by Women in the United States: Results from a Nationally Representative Study*, 6 Journal of Sexual Medicine 1857, 1857-58 (2009) (hereinafter "Herbenick"); Danielle J. Lindemann, *Pathology Full Circle: A History of Anti-Vibrator Legislation in the United states*, 15 Colum. J. Gender & L. 326, 336-341 (2006).

[9] *See* Rullo at 1 ("[V]ibrators can be classified by the FDA as obstetrical and gynecological therapeutic devices for

disorder.[10]  It can increase women's sexual desire.[11]  And it improves overall sexual health and function.[12]

       44.     Vibrator usage can also ameliorate unpleasant genital symptoms. Genital vibration can decrease physical discomfort associated with genito-pelvic pain penetration disorder, provoked vestibulodynia, and vulvodynia.[13]  It can facilitate blood flow to the genitals, thereby relieving vaginal dryness.[14]  And vaginal stimulation may decrease pain sensitivity without sacrificing tactile sensitivity.[15]

       45.     Because insufficient arousal may lead to pain during sex or difficulty achieving orgasm, a vibrator's tendency to increase female arousal is particularly significant.[16]

       46.     One nationally representative study of 2,056 women concluded that vibrator use is "(i) common among diverse groups of women; (ii) associated with health-promoting behaviors; (iii) associated with positive sexual function; and (iv) rarely related to negative side effects."[17]

       47.     In short, vibrator usage is "a valuable tool for health care providers in the treatment of sexual function concerns."[18]

---

the treatment of sexual dysfunction . . . vibrators have been shown to provide sexual health benefits for patients").
[10] Rullo at 5-6, Herbenick at 1857-66.
[11] *Id.* at 5.
[12] *Id.* at 8.
[13] *Id.* at 7.
[14] Sandra R. Leiblum, *Arousal disorders in women: complaints and complexities*, 178 Medical Journal of Australia 638, 638-39 (2003) (hereinafter "Leiblum").
[15] Beverly Whipple and Barry R. Komisaruk, *Elevation of Pain Threshold by Vaginal Stimulation in Women*, 21 Pain 357, 357 (1985); *see also* Stuart Brody, *The Relative Health Benefits of Different Sexual Activities*, 7 International Society for Sexual Medicine 1336, 1341 (2010) (hereinafter "Brody").
[16] Leiblum at 638-39; Rullo at 5, Herbenick at 1863.
[17] Herbenick at 1863.
[18] Rullo at 8.

48.     Sexual wellness and satisfaction, in turn, are positively correlated with an array of broader health benefits, and "individuals who engage in regular sexual activity have better health."[19]

49.     For example, frequent intercourse has been linked to a greater satisfaction with one's mental health and has mood-enhancing benefits,[20] and frequent masturbation and orgasm has been linked with mood enhancement, the reduction of menopausal symptoms, and emotional intelligence.[21]

50.     Orgasm can relieve dysmenorrhea (menstrual cramps) and more generalized physical pain, even during labor and childbirth.[22]

51.     And vibrator users are more likely to obtain regular gynecological exams and perform genital self-examinations.[23]

52.     The health benefits associated with genital vibration and a healthy sex life are integral to Dame's mission.  By marshaling these benefits in conjunction with comprehensive consumer feedback, Dame revolutionized the sex toy industry.

53.     Before Dame upended the vibrator market with its signature product, a hands-free vibrator called Eva,[24] many sex toys on the market were ineffective for women, intrusive for men in heterosexual partnerships, or simply inferior in design or function.

---

[19] Lisa M. Diamond & David M. Huebner, *Is Good Sex Good For You? Rethinking Sexuality and Health*, 6(1) Social and Personality Psychology Compass 54, 56 (2012).
[20] Brody at 1340.
[21] Breanne Fahs & Elena Frank, *Notes from the Back Room: Gender, Power, and (In)Visibility in Women's Experiences of Masturbation*, 51(3) Journal of Sex Research 241, 243 (2014) (hereinafter "Fahs").
[22] Roy J. Levin, *Sexual Activity, health, and well-being – the beneficial roles of coitus and masturbation*, 22:1 Sexual and Relationship Therapy 135, 142, 144 (2007).
[23] Fahs at 243.
[24] www.dameproducts.com/products/eva-ii, last accessed on June 18, 2019.

11

54.     Dame's meticulously-designed products address all of these deficiencies.  Eva is the first hands-free vibrator on the sexual device market.  It allows women to enjoy clitoral stimulation *during* penetrative sex while freeing their hands for use elsewhere.

55.     What is more, Eva conforms to a wide variety of differently-shaped and -sized vulvas.  It enhances penetrative sex of any kind by providing the clitoral stimulation many women need to achieve orgasm.  And it facilitates partner-focused intimacy by eliminating the need for a sex toy to be manually held to the body during intercourse or other sexual activity.

56.     Eva flew off the shelves to women—and their sexual partners—eager for precisely this new kind of sex toy.  Eva's popularity has proven so enduring that Dame currently markets and sells Eva II, a smaller, more streamlined version of the company's initial offering that was tweaked to incorporate first-round consumer feedback.

57.     In short, Eva—and Dame's array of other vibrators and sexual tools— accomplish exactly what Dame has always set out to do: help women marshal the myriad health benefits associated with sexual wellness.

## II.     After Stringing Dame Along for Months, The MTA Suddenly Bans the Proposed Advertisements

### *Dame Requests to Advertise on MTA Property*

58.     In August 2018, Dame reached out to the MTA's advertising contractor, OUTFRONT Media ("OUTFRONT"), hoping to purchase remnant inventory and display its advertisements on the MTA's trains, buses, and facilities.  Dame made clear that it was eager to advertise its products on the MTA's vehicles, facilities, and other property (the "Property").

59.     Dame understood that its advertisements would be vetted pursuant to the MTA's publicly-available Advertising Policy, which is designed to "establish uniform, reasonable, and viewpoint-neutral standards for the display of advertising" on the Property.

60.     The MTA website displays Frequently Asked Questions about the Policy, which reiterate that the "MTA is committed to ensuring that [the Policy] is enforced in a viewpoint-neutral fashion."

61.     Dame submitted six sample advertisements to Howard Marcus ("Marcus"), a representative of OUTFRONT, on July 24, 2018.









62.     Upon receipt of these advertisement submissions, Marcus welcomed Dame with open arms, responding that the advertisements were "[v]ery thought provoking."

63.     Dame emailed Marcus on August 1, August 7, August 14, and August 21, 2018, seeking an update on its submission and hoping for a response from the MTA.  Each time, Marcus informed Dame that no response had materialized.

64.     On September 6, 2018, Dame again emailed Marcus, offering to resubmit its proposed advertisements and inquiring about the MTA's delay.

65.     Marcus responded: "It's being circulated through the various departments.  This is a sensitive subject so it does take a bit longer for approval."

66.     Finally, on September 14, 2018, Marcus emailed Dame.  He explained that the MTA had "an uneasy sense regarding the undertone of the ad," and requested that Dame "submit a version without the 'trains' and 'tunnel' text."

67.     Dame responded, noting that it had "already begun working on some other versions of our ads" and that it was "excited to submit some creative options."

***Dame Carefully Revises its Proposed Advertisements to Reflect the MTA's Feedback***

68.     Just over a week later, Dame submitted a second round of proposed advertisements to Marcus on September 24, 2018.  These revised advertisements reflected

OUTFRONT's creative feedback and sought to accommodate the MTA's concerns, as communicated to Dame by Marcus.













69.     Dame told Marcus that "[w]e do, of course, still make some train references but they are indeed much softer."

70.     That same day, Marcus replied: "Ha, I like these."  He told Dame that he would send its new submissions to his supervisor and would keep them posted.

71.     No update came for several weeks.  Dame wrote to Marcus on October 1, 2018 and October 4, 2018.  Marcus did not reply.

72.     On October 5, 2018, Marcus at last responded to Dame.  He said that the MTA had "[n]o objections" to the first two revised advertisements, "Toys for Sex" and "Get from Point A to Point O."

73.     Dame was thrilled its advertisements would, as planned, be displayed on MTA Property.  "This is fantastic news," Dame wrote to Marcus, saying: "We will pop champagne for this one."

74.     However, the news was not all good.  Marcus told Dame that the remaining four advertisements were "not allowable as submitted" because they "entangle the MTA and its service and customers with the promoted product, which is contrary to one of the Advertising Policy's objectives."

75.     In response, Dame expressed its excitement about the two approved ads, but noted that the other four advertisements were merely "plays on words" and that other advertisements the MTA had already approved themselves "entangle the MTA experience with the ad messaging."

76.     As an example, Dame cited two advertisements for Thinx (underwear for menstruation) which the MTA had approved.  One reads: "Period-Proof Underwear That's Gr8 For Like If Your Period Unexpectedly Comes and There's Delays Due to Train Traffic."



77.     The other reads: "Period-Proof Underwear That's Actually Waaay Less Gross and Waaay More Hygienic Than That Pole You're Holding RN [Right Now]."



78.     Dame pointed out that both of these advertisements—already approved and displayed on MTA property—plainly implicated the MTA and its train service. "If the THINX [ads] with the gross poles and the delays due to train traffic went through," Dame wrote to Marcus, "these certainly ought to."

79.     Dame further wrote: "[We] bring your attention to these [advertisements] not because there was anything wrong with them, but the opposite—just to show that if these did, in fact, go through, then Dame's copy should too."

80.     Nevertheless, Dame offered to "massage the messaging a little" and submit further revised advertisements.

81.     Marcus responded only that the relevant "guidelines prohibit this type of connection to the MTA."

82.     While Dame worked to incorporate the MTA's feedback, it communicated with Marcus about moving forward with the two advertisements that the MTA had approved.

83.     Marcus provided Dame with logistical details about payment, timelines, and other necessary information.  At substantial expense and with much anticipation, Dame prepared to finalize its advertisements.

### The MTA Rejects Dame's Advertisements Without Notice

84.     On November 2, 2018, Dame submitted a third set of advertisements to Marcus.  These advertisements removed any mention of the MTA or its services and focused, instead, on customer testimonials.

85.     Dame told Marcus: "We strongly view these as the best representation of our brand + products while also remaining cognizant of MTA feedback."

  

 

86.     Marcus responded: "I think this shows a nice effort and I will send over."

87.     Yet again, the MTA was radio silent for weeks.  Dame contacted Marcus on November 7, November 9, November 13, November 16, and November 19.  Marcus was unable to provide updates on the status of Dame's proposed ads.

88.     On November 26, 2018, Marcus finally contacted Dame.  Dame's ads—painstakingly revised for months in order to cater to the MTA's feedback—had been rejected, including the two ads the MTA had previously approved for display.

89.     Marcus wrote: "I wish I had some better news.  It looks like we will be unable to run this ad content.  The MTA will be releasing a new Q and A regarding advertising guidelines.  I will send it over as soon as I receive it."

90.     On December 3, 2018, Marcus again contacted Dame, forwarding a Memorandum from Defendant Janno Lieber, the MTA's Chief Development Officer.  The letter stated, in relevant part:

> After a careful review, the MTA determined that the proposed ads promote a sexually oriented business, which has long been prohibited by the MTA's advertising standards.
>
> Under these advertising standards, which have been established by the MTA Board, the MTA and its advertising contractors do not accept for display on MTA properties any advertisement that does not comply with any of our specific standards; these standards are applied evenly to all genders and are posted online on the MTA's website . . .
>
> In our view, as reflected in a recently issued addition to the MTA's Frequently Asked Questions relating to advertising, advertisements promoting sex toys or devices, such as the ads Dame Products has proposed for display, are promoting a sexually oriented business.  No ads for sex toys or devices have previously been displayed on MTA properties.

91.     Marcus wrote, "My apologies for how this turned out."

92.     Upon information and belief, the section of the MTA's Frequently

Asked Questions cited by Defendant Lieber was concocted specifically to "justify"

Defendants' denial of Plaintiff's proposed advertisements.

***Dame Unsuccessfully Attempts to Reason with the MTA***

93.     Hoping for answers, Dame emailed Marcus and others, asking the MTA

to explain how certain advertisements it previously approved "are not sexual." Dame

explained that "vibrators are excellent for uplifting low libido" and included eight medical

studies regarding the sexual health benefits of genital vibration.

94.     Dame received no response.

95.     Dame's CEO, Alexandra Fine, sent Marcus a lengthy response to the

MTA's ban of its advertisements, requesting that Marcus forward the message to his

supervisors. The response read:

> **To our potential partners at the MTA,**
>
> I'm Alexandra Fine, co-founder, and CEO of Dame Products. We're a company
> from Brooklyn that develops toys for love, intimacy and yes: sex.
>
> We just received word through our contact at Outfront Media that our ad campaign
> – which was greenlit months ago – has since been rejected in light of new
> advertising guidelines.
>
> First, I want to express my appreciation for the difficulty and importance of getting
> advertisement guidelines right. We got into this business to make a positive impact
> on the world, and we agree that ads shouldn't be harmful or deceitful.
>
> That's why this change of heart comes as a surprise to us. The ads we submitted
> were tasteful, attractive, and above all, honest. There were no scantily-clad bodies,
> no bawdy puns, and no disingenuous claims. Our campaign featured simple, clean
> product shots and quotes from our many happy customers – real people from
> different ages and backgrounds who felt that our products added value to their lives,
> and wanted others to know it.

20

With this in mind, we have to assume that our ads were denied on the basis that vibrators are for pleasure, while products promoting erectile dysfunction and libido drugs, for instance, address some clinical idea of "arousal."

As a Master in clinical psychology specializing in sexual health, I can tell you that vibrators are proven to boost libido and aid arousal.  I'd be happy to send along some of the many scientific studies saying so.  Please let us know if this could be a quick fix for our campaign.

We're proud of the fact that our products have a profound impact on our customers' lives without the need for pharmaceuticals.  We've worked hard to make toys that are safe for the body, satisfying, reliable, and easy to use whether you're 19 or 99.  We do this because people with vulvas have not been at the wheel when it comes to developing products for their own pleasure.  We're finally bringing their desires and experiences to bear in a male-dominated industry rife with phallic monstrosities and toxic materials, and packaging them in a way that's no more vulgar than any other high-end brand.  That you've turned down ads featuring testimonials from our happiest customers is especially disheartening.  In rejecting our campaign, you've created a gulf between people with vulvas and the innovators working diligently to improve their lives.

I also want to make it clear that by rejecting a campaign we've been working on for months, you've set us back financially.  We're a female-owned, majority-minority company, and a jewel in Brooklyn's startup scene, contributing to New York's tax base while employing women and minorities in STEM positions.  A great deal of time and money was spent responding and bending to your direct feedback.  We went through several rounds of revisions, saved up money, and passed on other opportunities, paying agencies and freelancers all the while.  Your "No" came after three weeks of silence, just before our holiday season.  If your agency claims to help the small business women of the Empire State, then we would love to understand your reasoning behind this exhausti[ng] and abortive review process.

96.     The MTA never responded to Dame's letter.

97.     Dame forwarded the same letter to Andy Byford, the President of the New York City Transit Authority, hoping that his influence within the MTA might prompt reconsideration of the decision to ban Dame's proposed advertisements.

98.     Byford responded, noting that he had no authority over advertising decisions but offering to put Dame in touch with John McKay and Fredericka Cuenca, staff

21

members at MTA's Headquarters.  "While I can't change the whole MTA," Byford wrote, "I

am determined to make my bit, New York City Transit, responsive and transparent."

99.    Byford wrote to Fine: "I *cringed* when I read of your experience."

100.    The MTA's "Frequently Asked Questions" about its Advertising Policy

directs advertisers to contact Cuenca if they believe the Policy "is being enforced in a

viewpoint discriminatory manner by the MTA or its advertising licensee."

101.    But McKay and Cuenca never responded to Dame's letter.

### Dame Suffers Substantial Economic Harm as a Result of the MTA's Decision

102.    As CEO Alexandra Fine noted to Marcus, Dame—a small startup—

suffered substantial economic losses from the MTA's denial of its proposed advertisement.

103.    Between May 2018, when Dame began creating its pitch to the MTA,

and December 2018, when the MTA banned Dame's ads, Dame spent approximately $150,000

on staff payment, advertisement revision and development, and preparation for what the MTA

had led Dame to believe would be an extensive advertising campaign.

104.    Dame also bypassed other business opportunities in reliance on the

MTA's representation that it intended to run Dame's advertisements.

105.    Dame has no way to recoup the costs it has already lost because of the

MTA's unlawful decision to ban its advertisements.  And it is impossible to calculate how

much revenue Dame will never realize because the MTA did not approve its advertisements.

106.    This financial damage cannot be undone.

### The MTA's Historically Poor Treatment of Companies That Sell Sex Tools for Women

107.    This is not the first time that the MTA has courted—and then banned—a

company seeking to advertise tools for sex on MTA Property.

108.    In May 2018, the MTA banned proposed advertisements from sex toy company Unbound—including the one pictured below—on the grounds that they violated the agency's prohibition against obscene content.[25]



109.    After substantial public outcry, the MTA reversed course later that month, pledging to the New York Times that it would "work with the company toward a resolution that is agreeable to all parties and allows their ads on the system."[26]

110.    Despite this public pledge, the MTA never made good on its word.

111.    Instead, the MTA ordered Unbound to change its proposed imagery, eliminating what the MTA deemed "phallic symbols" in its advertisements.[27]

---

[25] Section B.7 of the MTA's Advertising Policy bars advertising that "[d]epicts or describes in a patently offensive manner sexual or excretory activities so as to satisfy the definition of obscene material as contained in New York Penal Law § 235.00."

[26] *See* www.nytimes.com/2018/05/17/nyregion/subway-sex-toy-ads-mta.html, last visited on June 18, 2019.

[27] *See* www.vice.com/en_us/article/3k9gx3/mta-bans-sex-toys-ads-dame-unbound, last visited on June 18, 2019.

112.    Citing a number of advertisements containing phallic imagery that the MTA had already approved, Unbound refused to cave to what it termed the MTA's "ridiculous double standard."[28]

113.    The advertisements Unbound submitted were never approved or displayed by the MTA.

### III.    The MTA Has Long Embraced Advertisements That Are Visually Explicit, Sexually Suggestive, or That Promote Sexually Oriented Businesses

114.    In his letter denying Dame's request for advertisement space on MTA Property, Defendant Janno Lieber cited Section B.15 of the MTA's Advertising Policy.  That Section states that the MTA "will not accept any advertisement for display in or on the Property if it . . . [p]romotes an escort service or sexually oriented business."

115.    Lieber stated that advertisements promoting sexually oriented businesses have "long been prohibited by the MTA's advertising standards."

116.    But this supposedly long-standing prohibition has been applied unevenly and unfairly, if at all.

117.    The MTA has repeatedly approved advertisements that promote businesses that are "sexually oriented" under any reasonable definition.  It has repeatedly approved advertisements that use overt sexual imagery to sell products.  It has repeatedly approved advertisements that contain explicit sexual slogans or text.  These decisions promote much-needed public discussion about sex.

118.    But MTA has never explained why some sexually-oriented advertisements are allowed, while others are not.

_____

[28] *See* www.vice.com/en_us/article/3k9gx3/mta-bans-sex-toys-ads-dame-unbound, last visited on June 18, 2019.

119.    For example, the MTA has approved numerous advertisements for hims, a company that sells medication to treat erectile dysfunction.  Advertisements for hims feature cactuses meant to resemble flaccid or erect penises as well as explicit sexual slogans or puns. One advertisement reads: "man problems.  man solves."  Another reads: "thanks to science, ED can be optional."  A third: "hard made easy."

 



120.    The MTA apparently did not apply the Policy to hims or concluded that hims—a company that markets medication to give men erections for the purpose of sex—is not a "sexually oriented business."

121.    The MTA did so despite the fact that hims' phallic imagery is far more overt and explicit than the advertisements submitted by Unbound.

122.    The MTA approved advertisements for other companies that market erectile dysfunction medication.  One advertisement for a company called Roman riffs on the

stigma against erectile dysfunction: "Erectile dysfunction meds prescribed online, delivered to

your 'friend's' door."



123.    The MTA apparently did not apply the Policy to Roman or concluded

that Roman—a company that, like hims, markets medication to give men erections for the

purpose of sex—is not a "sexually oriented business."

124.    The MTA has approved advertisements sponsored by the New York

City Health Department for "Kyng"-sized condoms and PrEP, a pill that protects against HIV.

One advertisement reads: "Sexy.  Seguro [safe]."  The other reads: "We Play Sure."

 

125.    The MTA apparently did not apply the Policy to the Department of

Health or concluded that this campaign to encourage condom and PrEP usage—for the purpose

of intercourse or other sexual activity—was not "sexually oriented."

126.    The MTA has approved multiple advertisements for hers, a brand that markets birth control and libido medication for women.  One hers advertisement reads: "Birth control.  Now in my control."  Another reads: "Turned on.  On your terms."  And a third: "Men have 26 pills to make them hard.  It's time we got ours."

 



127.    The MTA apparently did not apply the Policy to hers or concluded that hers—a business that markets birth control pills designed to prevent pregnancy from sex and medication to increase women's libido and arousal for sex—is not a "sexually oriented business."

128.    The MTA has approved advertisements for Thinx, a company that markets underwear for menstruation.  Thinx's unique, frank advertisements feature raw eggs and peeled oranges alongside women in belly-baring tops and panties.



129.    The MTA has approved multiple advertisements for the Museum of

Sex—which, in fact, sells and profits from Dame's products.  One Museum of Sex

advertisement features sets of naked buttocks.  Another depicts a woman and four men

entwined on a couch; one man's crotch is clearly outlined by his tight leather pants.  A third

shows two women dancing in a room whose walls are made of plastic breasts.



 

130.    The MTA apparently did not apply the Policy to the Museum of Sex

concluded that the Museum—a profitable business whose mission is "advocating open

discourse surrounding sex and sexuality"[29]—is not a "sexually oriented business."

131.    The MTA approved an advertisement for the dating service OkCupid.

Depicting two women gazing into one another's eyes and one woman grabbing the other's rear

end, the advertisement reads: "DTFall Head Over Heels."  The abbreviation "DTF" refers to

the common phrase "down to fuck."[30]



---

[29] *See* www.museumofsex.com/museum/about/history/, last accessed on June 18, 2019.
[30] *See* https://en.wiktionary.org/wiki/DTF, last accessed on June 18, 2019.

132.    The MTA apparently did not apply the Policy to OkCupid or concluded that OkCupid—a dating and hookup service whose advertisements use an explicit sexual pun—is not a "sexually oriented business."

133.    Dame applauds the MTA's decision to feature advertisements for businesses—like hims, hers, Roman, the Museum of Sex, and Thinx—that support sexual and reproductive wellness and foster open discourse about human sexuality.  But the MTA has never explained to Dame—or to the public—why it selectively and baselessly applied the Policy to exclude Dame's advertisements.

134.    In addition to advertisements about sexual health and function, MTA trains, subway stations, and buses are also rife with advertisements that use sexual imagery or explicit sexual text to sell other consumer goods.

135.    For example, the MTA approved an advertisement for breast augmentation services.  It pictures the same woman, twice: first, frowning while holding miniature tangerines in front of her chest, and, second, delightedly displaying large grapefruits instead.  On at least one train, this advertisement has been defaced with tags that read, "this oppresses women."



136.   The MTA has approved multiple other advertisements for breast augmentation services, one featuring little other than a large pair of breasts and the other featuring a naked woman, breasts concealed only by the word "BIG."



137.   The MTA has approved an advertisement for wanderu, a travel booking company, with the explicit slogan: "Get Wet.  (On the beach, not from the guy next to you)."



138.   The MTA has approved an advertisement for Brooklinen, a luxury bedding company, that utilize a series of sexual double-entendres.  For example, one image that reads "For me time, or 'me' time" features a woman in bed, head blissfully thrown back and bra visible, with one hand disappearing beneath the covers.  Another image reads "For throuples, or three's a crowd," and features three pairs of socked feet protruding from beneath bedcovers.  A third image features a man and woman lying in bed and reads: "For foreplay, or four-twenty."

31



139. And the MTA has approved an advertisement for the 2010 movie "The Virginity Hit," which reads: "Still a Virgin? For help call 888-743-4335 toll free."



140. These advertisements are undeniable. The MTA has, apparently, declined to apply its prohibition on advertisements for "sexually oriented businesses" in the case of companies that market medication for erectile dysfunction in men and low libido in

women; campaigns that tout condom usage and prophylactic HIV medication; and a museum that profits from selling tickets for exhibits about sex and sexual activity.

141.    Yet, inexplicably, the MTA used that prohibition to target Plaintiff Dame Products and exclude Dame's advertisements from display on MTA Property.

142.    It did so even though Dame's high-end, tasteful sex tools facilitate female arousal and desire, just like the libido pills widely advertised on MTA Property by hers.

143.    It did so even though Dame's products facilitate successful penetrative sex, just like the erectile dysfunction medication widely advertised on MTA Property by Roman and hims.

144.    It did so even though Dame's products foster open, engaged discourse about sexual health and wellness, just like the New York City Health Department's MTA campaigns to promote condoms and PrEP.

145.    The MTA's decision to apply its Policy selectively to ban Dame's advertisements is irrational.  It is arbitrary.  And it is unconstitutional.

146.    The MTA has established a standardless standard—some sex-related products are welcomed; other similarly-situated products are banned.

147.    This uneven enforcement excludes Dame from a public forum that the MTA has made available for products relating to sex.

148.    The MTA believes it has *carte blanche* to censor and quash commercial speech without any legitimate basis.  It does not.

## IV.    The MTA's Refusal to Run Dame's Advertisements Reflects Its Victorian View of Sexuality and Disproportionately Harms Women

149.    The only explanation for the MTA's refusal to approve Dame's advertisements is its squeamishness about openly acknowledging female sexual pleasure.

150.    The MTA is not alone in its disdainful attitude towards the notion that women should, can, and do enjoy sex.  Our "culture's discomfort with women's sexuality" is well-known.[31]

151.    For example, the MTA approved multiple advertisements for hers, which markets medication to increase women's libido.  But hers advertisements emphasize function, not pleasure.

152.    The MTA is apparently comfortable advertising a product that renders women physically aroused enough for successful penetration.  But the MTA stops short when asked to advertise a product that ensures women actually enjoy penetration and other forms of sexual activity.

153.    That is censorship, it is sexism, and it entrenches a profoundly damaging vision of women's sexuality and equality.

154.    As commentators on sexual enhancement devices and advertisement opined: "If those deciding what can be advertised actually hold any such (unstated) views, then it offers at least some explanation as to why sexual aids for men can be openly marketed while female ones are to be shunned."[32]

155.    The MTA may not ban Dame's advertisements simply because it is uncomfortable acknowledging a fact that has been true since time immemorial: Women—like all people—enjoy sex.  Women—like all people—are entitled to enjoy sex.  Women—like all people—are entitled to have satisfying, intimate, and physically pleasurable sex, whether alone or with other people.

---

[31] Barkacs at 64 & n.8.
[32] *Id.* at 71.

156.     Because women suffer disproportionately from sexual dissatisfaction and dysfunction, advertisements for vibrators almost exclusively target women.

157.     The dearth of such advertisements on MTA Property speaks volumes.

158.     By banning Dame's advertisements, the MTA is telling the women of New York City that it does not care about their sexual health, well-being, and pleasure.

## FIRST CAUSE OF ACTION
### 42 U.S.C. § 1983 – First Amendment Violation

159.     Plaintiff repeats and realleges the preceding paragraphs as if fully set forth herein.

160.     Defendant MTA has designated its Property a public forum for commercial speech like advertisements.  Commercial speech is core protected activity under the First Amendment.

161.     In any kind of public forum, the government is prohibited from discriminating on the basis of the speaker's viewpoint.

162.     When Defendants denied Plaintiff's applications to advertise its products on the Property, they impermissibly curtailed Plaintiff's speech on the basis of viewpoint in contravention of the First Amendment.

163.     Defendants' denial operates as a prior restraint on Plaintiff's protected speech that barred Plaintiff's advertisements from being displayed in public.

164.     Furthermore, Defendant MTA's Advertising Policy gives Defendants unbridled discretion in determining whether to accept or reject applications for advertisement space on the Property.  The Policy thus constitutes a prior restraint and impermissibly empowers government officials to discriminate and censor speech in violation of the First Amendment.

165.     Because of this unbridled discretion, Defendants' decisions about which advertisements to display and which to ban are wildly inconsistent.  For example, the MTA either did not apply the Policy at all to companies that market erectile dysfunction medication or determined that those companies are not "sexually oriented businesses" under Section B.15 of the Policy.

166.     In contrast, and with no legitimate basis, the MTA either selectively applied the Policy to Plaintiff or determined that Plaintiff *is* a "sexually oriented business."

167.     The Policy provides no reliable standards by which Defendants can assess whether to accept or reject a proposed advertisement.  The Policy fails to define key terms and necessitates that Defendants exercise their judgment in each individual case.  The Policy gives Defendants unfettered power to discriminate against disfavored businesses by suppressing their expression—and Defendants used that power to discriminate against Plaintiff.

168.     As a result of Defendants' unlawful conduct, Plaintiff suffered the injuries hereinbefore alleged.

**SECOND CAUSE OF ACTION**
**42 U.S.C. § 1983 – Fourteenth Amendment – Void for Vagueness**

169.     Plaintiff repeats and realleges the preceding paragraphs as if fully set forth herein.

170.     The Due Process Clause of the Fourteenth Amendment prohibits states from promulgating statutes and regulations that are unconstitutionally vague.  A statute and/or regulation is void for vagueness if it "fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits."  *Hill v. Colorado*, 530 U.S. 703, 732 (2000).

171. Section B.15 of Defendant MTA's Advertising Policy states that the MTA "will not accept advertisement for display in or on the Property if it . . . [p]romotes an escort service or sexually oriented business."

172. This provision of Defendant MTA's Advertising Policy is unconstitutionally vague. The Policy does not define the term "sexually oriented business" or provide adequate guidance as to the definition of a "sexually oriented business." Compounding this facial deficiency, Defendants have applied the Policy inconsistently and without a rational basis, leading to selective and arbitrary enforcement.

173. People of ordinary intelligence, including Plaintiff and its staff, are forced to guess the meaning of that unspecified term and whether this provision of the Policy applies to them.

174. As a result of Defendants' unlawful conduct, Plaintiff suffered the injuries hereinbefore alleged.

**<u>THIRD CAUSE OF ACTION</u>**
**42 U.S.C. § 1983 – Fourteenth Amendment – Equal Protection Violation ("Class of One")**

175. Plaintiff repeats and realleges the preceding paragraphs as if fully set forth herein.

176. The MTA intentionally treated Plaintiff differently than similarly situated businesses whose advertisements have been approved and displayed on MTA Property. These businesses are applicable comparators for purposes of assessing the irrational discrimination at issue in this case.

177. Unlike other businesses that market sexually-oriented products—like hims (erectile dysfunction medication), Roman (erectile dysfunction medication and condoms),

hers (women's libido medication), the Museum of Sex, and OkCupid (dating and hookup service), Plaintiff was denied the opportunity to display its advertisements on MTA Property. Plaintiff, hims, Roman, hers, the Museum of Sex, and OkCupid all market sexually-oriented products and are identically situated with respect to Defendant MTA.

178.    This differential treatment of similarly-situated businesses lacked any reasonable nexus to a legitimate governmental policy.  This differential treatment was intentional, wholly arbitrary, and without a rational basis.

179.    Defendants offered no justification for its singling out of Plaintiff other than a self-serving statement in Defendant MTA's Frequently Asked Questions that was hastily drafted to cover up Defendants' arbitrary rejection of Plaintiff's advertisements.

180.    Defendants deliberately chose not to explain the true reasons for the denial of Plaintiff's application and chose, instead, to invoke pretextual justifications for the denial in order to impeded Plaintiff's ability to vindicate its constitutional rights.

181.    Plaintiff was singled out for this adverse treatment, which came only after Defendant MTA provisionally approved Plaintiff's proposed advertisements, thereby maximizing financial harm to Plaintiff.

182.     As a result of Defendants' unlawful conduct, Plaintiff suffered the injuries hereinbefore alleged.

## FOURTH CAUSE OF ACTION
### Article I, Section 8, of the New York State Constitution – Freedom of Speech

183.    Plaintiff repeats and realleges the preceding paragraphs as if fully set forth herein.

184.    The MTA has designated its Property a public forum for commercial speech like advertisements.  Commercial speech is core protected activity under Article I, Section 8 of the New York State Constitution.

185.    When Defendant MTA denied Plaintiff's applications to advertise its products on the Property, it impermissibly curtailed Plaintiff's speech on the basis of viewpoint in contravention of Article I, Section 8 of the New York State Constitution.

186.    Defendant MTA's denial operates as a prior restraint on Plaintiff's protected speech in contravention of Article I, Section 8 of the New York State Constitution.

187.    As a result of Defendants' unlawful conduct, Plaintiff suffered the injuries hereinbefore alleged.

*        *        *

WHEREFORE, Plaintiff respectfully requests judgment against Defendants as follows:

a.    Compensatory damages in an amount to be determined at trial;

b.    A declaration that Defendants' denial of Plaintiff's application for advertising space violates the First Amendment to the United States Constitution, the Equal Protection Clause, and Article I, Section 8 of the New York State Constitution;

c.    A declaration that Defendants' prohibition on advertisements promoting a "sexually oriented business" is void for vagueness;

d.    An injunction ordering Defendants to display Plaintiff's proposed advertisements of November 2, 2018 on MTA Property;

e.    Reasonable attorneys' fees and costs under 42 U.S.C. § 1988; and

f.    Such other and further relief as this Court may deem just and proper.

Dated: New York, New York

June 18, 2019

EMERY CELLI BRINCKERHOFF &
ABADY LLP

By:

Richard Emery
Emma L. Freeman
600 Fifth Avenue, 10th Floor
New York, New York 10020
(212) 763-5000

*Attorneys for Plaintiff*